## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JUAN MANUEL MOLINA,

      Petitioner,

v.                                    Case No. 8:23-cv-1923-WFJ-AAS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## **ORDER**

Juan Manuel Molina, a Florida prisoner, initiated this action by filing a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 10). Mr. Molina filed a reply. (Doc. 16). After careful review, the petition is **DENIED**.

## I.    **Background**

This case arises from the shooting deaths of Erica Crewe-White and Percy Basden. The victims and Mr. Molina lived within walking distance of each other in Tampa, Florida. (Doc. 11-1, Ex. 3, at 279, 347). Over a year before the shootings, Mr. Molina's son (Xavier Molina) was involved in an altercation with Mr. Basden's stepson (Solomon Medley) and Ms. Crewe-White's son (Denico Crewe-White). (*Id.* at 386-87). During this incident, Xavier[1] jumped out of a car and "started shooting down the street" at Mr. Medley and Mr.

_____

[1] To avoid confusion, the Court sometimes refers to certain parties by their first names. No disrespect is intended.

1

Crewe-White. (*Id.* at 369). None of the shots hit their target. (*Id.*) Mr. Medley took cover and shot back, hitting Xavier "in the hip." (*Id.* at 283). Xavier survived his injuries. (*Id.* at 880).

Another confrontation took place on October 19, 2013. This time, Mr. Molina's other son (Juan Carlos) brandished a knife at Denico Crewe-White and his nine-year-old brother. (*Id.* at 202-03). The Crewe-Whites fled on bicycles and rode to the apartment of their eldest brother, Deano Crewe-White. (*Id.* at 203-04). Their mother—Erica Crewe-White—picked them up in her minivan, took the youngest child home, and drove to Mr. Molina's house with Denico and Deano. (*Id.* at 294-95). The three got out of the van and knocked on the door. (*Id.* at 885). Mr. Molina emerged from the house, and Ms. Crewe-White shouted profanities at him, demanding to see his sons. (*Id.* at 886). According to Mr. Molina's trial testimony, Ms. Crewe-White retrieved a handgun from the van. (*Id.* at 892). Mr. Molina tried to disarm her. (*Id.*) During the struggle, the gun "went off," firing a single shot that killed Ms. Crewe-White. (*Id.*) After the shot was fired, Deano pulled out a handgun, prompting Mr. Molina to shoot at him with Ms. Crewe-White's gun. (*Id.* at 893). Deano and Denico then fled the scene. (*Id.* at 212-13, 893).

Mr. Medley and his stepfather Mr. Basden lived "four houses down" from Mr. Molina's house. (*Id.* at 234-35). During the October 19 incident, Mr. Medley "heard gunshots" and grabbed his handgun. (*Id.* at 357). He looked through a kitchen window and "lock[ed] eyes" with Mr. Molina, who was standing in the front yard. (*Id.* at 360). Mr. Medley told Mr. Basden to stay on the couch. (*Id.*) Mr. Basden got up, and Mr. Molina fired a single shot through the front door, killing Mr. Basden. (*Id.*) Mr. Medley then saw

Mr. Molina "trying to come through the [kitchen] window." (*Id.* at 361). Mr. Medley fired three times "out the window," striking Mr. Molina in the face. (*Id.*) Through DNA analysis, law enforcement later determined that Mr. Molina had bled onto a curtain and garbage can in the kitchen. (*Id.* at 654-55, 783-87).

Mr. Molina was ultimately charged with one count of second-degree murder for killing Ms. Crewe-White, two counts of aggravated assault for firing at Denico and Deano Crewe-White, one count of second-degree murder for killing Mr. Basden, one count of armed burglary of Mr. Basden's dwelling, and one count of shooting into Mr. Basden's dwelling. (*Id.*, Ex. 2). The case went to trial. (*Id.*, Ex. 3). Mr. Molina claimed that he acted in self-defense during both shootings. (*Id.* at 979). He testified that, after the gun "went off" and killed Ms. Crewe-White, he saw "more than seven people" running toward him. (*Id.* at 895). To "get them further away" from his house, Mr. Molina ran toward Mr. Basden's residence. (*Id.* at 895-96). He "passed . . . by the window of the house," and Mr. Medley shot him in the face. (*Id.* at 898). Then Mr. Basden allegedly opened the front door and "point[ed]" a "pistol" at Mr. Molina, who responded by firing his gun as Mr. Basden "closed the door." (*Id.* at 899-900).

Mr. Molina was acquitted of the counts relating to the Crewe-Whites. (*Id.*, Ex. 4). But he was convicted of second-degree murder as to Mr. Basden, as well as armed burglary and shooting into a dwelling. (*Id.*) Mr. Molina received a total sentence of thirty-five years' imprisonment. (*Id.*, Ex. 6). Following an unsuccessful direct appeal, Mr. Molina moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. 12, 14).

The postconviction court rejected his claims after an evidentiary hearing, and the appellate court affirmed. (*Id.*, Exs. 15, 19-20, 24). This federal habeas petition followed. (Doc. 1).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

4

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court in Mr. Molina's case affirmed his convictions, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

### B.    Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The

exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.  Ineffective Assistance of Counsel

Mr. Molina alleges ineffective assistance of counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of

professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Molina must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Molina must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.    Discussion

### A.    Grounds One through Three—Sufficiency of the Evidence

Mr. Molina argues that the trial court violated his right to due process by denying his motion for judgment of acquittal. (Doc. 1 at 3-8). Specifically, he contends that the evidence was insufficient (1) to "refute [his] claim" that he acted in self-defense when he shot Mr. Basden, (2) to prove that he acted with "ill will, hate, spite, or evil intent" when he shot Mr. Basden, and (3) to establish that he committed burglary. (*Id.*)

Mr. Molina's sufficiency challenge is unexhausted and procedurally defaulted. Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). A petitioner must do more, however, than "scatter some makeshift needles in the haystack of the state court record." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). Moreover, a petitioner "does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief" to find the "federal claim." *Baldwin*, 541 U.S. at 32.

Mr. Molina failed to present his federal constitutional claim on direct appeal. In his appellate brief, he argued that the trial court "erred in denying [his] motion for judgment of acquittal." (Doc. 11-1, Ex. 8, at 10-30). But he did not cite the United States Constitution

8

or any other source of federal law. Nor did he "label[ ] the claim 'federal.'" *Baldwin*, 541 U.S. at 32. Instead, Mr. Molina relied entirely on Florida caselaw to support his argument that the evidence was insufficient to support his convictions for second-degree murder and burglary. (Doc. 11-1, Ex. 8, at 10-30). Because Mr. Molina "did not raise any federal claims or cite to any federal cases in state court when presenting his argument on the sufficiency of the evidence," he "failed to fairly present his federal sufficiency-of-the-evidence claim to the Florida state courts and thus did not exhaust his state court remedies as to that claim." *Cascante v. Florida*, 816 F. App'x 429, 431 (11th Cir. 2020); *see also Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 459 (11th Cir. 2015) (holding that federal sufficiency-of-the-evidence claim was not exhausted because petitioner "asserted in his [state appellate] brief that his conviction rested on insufficient evidence, without clarifying whether he intended to bring a federal or a state sufficiency of the evidence claim"); *Gallagher v. Sec'y, Fla. Dep't of Corr.*, No. 22-13954, 2024 WL 3289639, at *2 (11th Cir. July 3, 2024) ("[B]ecause [petitioner] never cited . . . any [ ] federal case when arguing in the state court that there was insufficient evidence for a conviction that would alert the state courts to the federal nature of his claim, he did not 'fairly present' the issue to the state courts.").

Mr. Molina cannot return to state court to present his unexhausted sufficiency challenge in a second, untimely direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within thirty days of the rendition of a sentence). As a result, Grounds One through Three are procedurally defaulted. *See Smith*, 256 F.3d at 1138 ("If the petitioner has failed to exhaust state remedies that are no longer available, that

failure is a procedural default which will bar federal habeas relief, unless either the cause
and prejudice or the fundamental miscarriage of justice exception is established."). Because
Mr. Molina offers no basis to excuse the default, his sufficiency challenge is barred from
federal habeas review.[2]

## B.   Ground Four—Failure to File Stand-Your-Ground Motion

Mr. Molina argues that trial counsel was ineffective for failing to file a pretrial
motion to dismiss under Fla. Stat. § 776.032, Florida's stand-your-ground statute.[3] (Doc. 1
at 9). According to Mr. Molina, he "acted in self-defense when he shot [Ms. Crewe-White]
and Mr. Basden." (*Id.*) Mr. Molina contends that "counsel's decision not to move for a
pretrial immunity hearing was due to counsel's ignorance [of] the law or inattention rather
than any strategic or tactical decision." (*Id.*) Had counsel filed a stand-your-ground motion,
Mr. Molina allegedly "would have prevailed in dismissing" all charges before trial. (*Id.* at
9-10).

The postconviction court rejected this claim after an evidentiary hearing. (Doc. 11-
1, Ex. 20, at 2-5). It summarized counsel's testimony at the hearing. (*Id.* at 3-4). As the
court explained, counsel "testified it was a strategic decision not to file a pretrial immunity

---

[2] Even if the sufficiency challenge were not defaulted, Mr. Molina would not be entitled to relief. For the
reasons explained in the State's appellate brief, a rational jury could find beyond a reasonable doubt that
Mr. Molina committed second-degree murder when he shot Mr. Basden, and that he committed armed
burglary during the shooting. (Doc. 11-1, Ex. 9, at 11-30).

[3] Under Florida law, "[t]he first step in seeking dismissal based on self-defense immunity requires that a
*prima facie* claim of self-defense immunity from criminal prosecution has been raised by the defendant."
*State v. Moore*, 337 So. 3d 876, 880 (Fla. 3d DCA 2022). "Once a defendant has met this threshold, the
burden of proof by clear and convincing evidence is on the party seeking to overcome the immunity from
criminal prosecution." *Id.*

motion." (*Id.* at 3). Specifically, counsel stated that self-defense was Mr. Molina's "only defense," and that he made a "strategic[ ]" decision to forgo a stand-your-ground motion because he did not want to disclose his defense theory to the prosecution before trial. (*Id.*, Ex. 19, at 14, 16-17). According to counsel, a stand-your-ground motion would have required Mr. Molina to "put it all out there" "pretrial," and "then he would be stuck with whatever version he was stuck with in that pretrial motion." (*Id.* at 17). The court credited counsel's testimony, finding that he "made a reasonable, strategic decision to forgo a pretrial immunity motion in order to present self-defense at trial where the standard of proof would be more favorable and where the defense would have the benefit of hearing all of the State's evidence." (*Id.*, Ex. 20, at 4-5). Thus, the court concluded that Mr. Molina "ha[d] not established deficient performance." (*Id.* at 5).

This ruling was reasonable. "There is a strong presumption that counsel's performance falls within the wide range of professional assistance[;] the [petitioner] bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. It is "a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011). "[I]t is rarer still for merit to be found in a claim that challenges a strategic decision of counsel." *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019).

11

The postconviction court reasonably concluded that counsel made a sensible, strategic decision to forgo a stand-your-ground motion. As explained above, counsel testified that he chose not to file such a motion in order to avoid disclosing his defense theory to the prosecution before trial. (Doc. 11-1, Ex. 19, at 14, 16-17). Based on this testimony, a reasonable jurist could conclude that counsel was not deficient for failing to pursue a stand-your-ground motion. *See Brown v. Fla. Dep't of Corr.*, No. 22-cv-60645, 2023 WL 2734227, at *6 (S.D. Fla. Mar. 31, 2023) (holding that trial counsel made "strategic decision[ ]" to forgo stand-your-ground motion based on concerns about "potential prejudice [p]etitioner would face if his testimony were used at a later trial"); *Boyington v. Sec'y, Fla. Dep't of Corr.*, No. 3:18-cv-810-BJD-MCR, 2021 WL 719644, at *4-5 (M.D. Fla. Feb. 24, 2021) ("When counsel made a strategic decision not to raise the Stand Your Ground immunity issue prior to trial, he based it on the state of the law at the relevant time, and he knew and understood the Stand Your Ground law and made a strategic decision not to raise the matter pre-trial."); *Jackson v. Fla. Dep't of Corr., Sec'y*, No. 5:16-cv-301-LC-CJK, 2018 WL 3433300, at *9 (N.D. Fla. June 12, 2018) ("[T]he state court reasonably concluded that counsel's failure to file the motion to dismiss petitioner now proposes was a strategic decision made after thorough investigation of the facts and careful, reasonable consideration of the advantages and disadvantages of moving to dismiss the charge on Stand Your Ground immunity."), *adopted by* 2018 WL 3430694 (N.D. Fla. July 16, 2018). Thus, the postconviction court reasonably rejected Mr. Molina's ineffective-assistance claim.

C.    **Ground Five—Failure to Retain Blood Spatter Expert**

Mr. Molina faults trial counsel for not hiring a "blood spatter expert." (Doc. 1 at 11). As noted above, law enforcement determined that Mr. Molina bled onto a curtain and garbage can in Mr. Basden's kitchen. (Doc. 11-1, Ex. 3, at 654-55, 783-87). A detective testified at trial that the blood made a "90-degree drop" into the garbage can, indicating that Mr. Molina was "standing over [it] and dropping blood straight down." (*Id.* at 654-55). According to Mr. Molina, this testimony "le[d] the jury to infer that [he] went in the window." (Doc. 1 at 11). He contends that a "blood spatter expert" could have "refuted" the detective's "opinion" by establishing that the "blood did not drop down." (*Id.* at 12). Instead, "the trajectory of the blood drop was more at a 45-degree angle coming in from outside the window." (*Id.*) This hypothetical expert testimony allegedly would have "given support" to Mr. Molina's claim that "he never entered the window." (*Id.*)

The postconviction court rejected this claim, holding that Mr. Molina "failed to demonstrate deficient performance or prejudice [from] counsel's failure to hire" a blood spatter expert. (Doc. 11-1, Ex. 20, at 6). The court explained that "[a]t the evidentiary hearing, [Mr. Molina] failed to testify about or call an expert witness to testify about the blood stains." (*Id.*) Thus, he did not "establish what a blood [spatter] expert would have testified to at trial," and he "failed to demonstrate how he was prejudiced by the lack of such testimony." (*Id.* at 7).

The rejection of this claim was reasonable. Mr. Molina never identified any blood spatter expert who could have provided the testimony he describes. Nor did he show that any expert "had actually reviewed the evidence in his case." *Finch v. Sec'y, Dep't of Corr.*,

643 F. App'x 848, 852 (11th Cir. 2016). "Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [Mr. Molina's] claims [was] mere speculation and [did] not entitle him to [ ] relief." *Id.* Thus, the postconviction court reasonably concluded that Mr. Molina's speculative allegations were insufficient to establish deficient performance or prejudice. *See, e.g.*, *Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (state court reasonably rejected ineffective-assistance claim based on failure to retain expert because "[i]t [was] speculative that an expert witness would in fact have testified" favorably to the defense); *Jimenez v. Sec'y, Dep't of Corr.*, No. 8:19-cv-684-MSS-AEP, 2021 WL 5416150, at *9 (M.D. Fla. Nov. 19, 2021) ("[I]n his post-conviction motion, [petitioner] neither identified an expert who could have testified [favorably to the defense] nor presented an affidavit or testimony to substantiate that testimony. Because [petitioner's] ineffective assistance of counsel claim was speculative, the state court did not unreasonably deny the claim.").

### D.    Ground Six—Failure to Impeach Mr. Medley with Prior Inconsistent Statements

Mr. Molina argues that trial counsel provided ineffective assistance by failing to impeach Mr. Medley with prior inconsistent statements. (Doc. 1 at 13). As noted above, Mr. Medley testified at trial that he "heard gunshots," grabbed his gun, and looked through a kitchen window. (Doc. 11-1, Ex. 3, at 357, 360). At this point, he "lock[ed] eyes" with Mr. Molina, who was standing in the front yard. (*Id.* at 360). After Mr. Molina shot Mr. Basden through the front door, Mr. Medley saw Mr. Molina "trying to come through the

[kitchen] window." (*Id.* at 361). Mr. Medley fired three times "out the window," striking Mr. Molina in the face. (*Id.*)

Mr. Molina alleges that Mr. Medley told a slightly different story when he spoke to law enforcement. (Doc. 1 at 13). Specifically, Mr. Medley said that he saw "a figure standing at the window waiting," that he "had not seen [the man] before," that he "did not know if he hit him," and that "he was basically aiming at [the man's] silhouette." (*Id.*) According to Mr. Molina, counsel should have used these prior inconsistent statements to "prov[e]" that "by Mr. Medley's own admission he only [saw] a 'figure' by the window, contrary to [his trial testimony that he saw Mr. Molina's] face coming in the window." (*Id.* at 14). This allegedly would have established that Mr. Molina "never . . . intended to break in the window." (*Id.*)

The postconviction court rejected this claim for lack of "prejudice." (Doc. 11-1, Ex. 20, at 8-9). It explained that "[e]ven if counsel had been able to impeach Mr. Medley about only seeing a figure (instead of seeing [Mr. Molina]), [Mr. Molina] testified at trial that he was on the victim's property and [was] shot as he walked by the window." (*Id.* at 9). Thus, "there [was] no dispute as to whether Mr. Medley could have seen [Mr. Molina] outside the window." (*Id.*) Moreover, even if counsel had "attempted to impeach Mr. Medley with an alleged prior inconsistent statement that [Mr. Molina] did not break the glass," the "DNA evidence" established that Mr. Molina's "DNA was inside the victim's kitchen and on the curtain." (*Id.*) This evidence contradicted Mr. Molina's assertion that "he simply walked by the window" without trying to break in. (*Id.*) Thus, "even if counsel had impeached Mr. Medley on this issue, the jury would still have been left with [Mr. Molina's]

testimony that he was shot as he walked *outside* the victim's home while his DNA was found *inside* the home in the exact area where Mr. Medley testified [Mr. Molina] was attempting to enter." (*Id.*) Given "the inconsistency between [Mr. Molina's] trial testimony and the DNA evidence"—which "would have remained even if counsel had impeached Mr. Medley"—the court found that Mr. Molina "ha[d] not established prejudice." (*Id.*)

This ruling was reasonable. "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Molina]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Mr. Molina cannot meet this demanding standard. As the postconviction court explained, Mr. Molina admitted at trial that he "passed . . . by the window of the house" when Mr. Medley shot him in the face. (Doc. 11-1, Ex. 3, at 898-99). Thus, even if the jury had learned of Mr. Medley's prior statement that he saw only a "figure" outside the window, counsel could not have plausibly argued that the "figure" was anyone other than Mr. Molina. Furthermore, any impeachment of Mr. Medley would not have "prove[n] to

the jury that [Mr. Molina] never . . . intended to break the window." (Doc. 1 at 14). As the postconviction court explained, Mr. Molina's "DNA was found inside the home in the exact area where Mr. Medley testified [Mr. Molina] was attempting to enter." (Doc. 11-1, Ex. 20, at 9 (emphasis omitted)). This evidence refuted Mr. Molina's assertion that "he simply walked by the window." (*Id.*) Accordingly, a fairminded jurist could find no "reasonable probability" that "the outcome at trial would have been different" had counsel impeached Mr. Medley with his prior inconsistent statements. *Reed*, 767 F.3d at 1261.

### E.    Ground Seven—Failure to Impeach Mr. Medley with Police Report

As noted above, Mr. Molina claimed that he acted in self-defense when he shot Mr. Basden. Specifically, he testified that as he "passed . . . by the window of [Mr. Basden's] house," Mr. Medley shot him in the face. (Doc. 11-1, Ex. 3, at 898). Then Mr. Basden allegedly opened the front door and "point[ed]" a "pistol" at Mr. Molina, who responded by firing his gun as Mr. Basden "closed the door." (*Id.* at 899-900). Mr. Medley, by contrast, testified that Mr. Basden never opened the front door or "threaten[ed]" Mr. Molina, and that "the shot came through the door and hit [Mr. Basden] in the chest." (*Id.* at 360, 371).

When law enforcement arrived at the house, an officer attempted to render first aid to Mr. Basden. (*Id.* at 847). The officer testified that he saw Mr. Medley holding a gun and "immediately" ordered him to "put the gun on the ground." (*Id.*) According to the police report, Mr. Medley "asked [the officer] what [he] wanted him to do with the firearm because he had fired it too." (*Id.*, Ex. 14, at Ex. B). Mr. Medley then put the gun down and

explained that "he had . . . shot" a man as he "was trying to enter the window." (*Id.*, Ex. 3, at 847-48).

Mr. Molina contends that counsel should have impeached Mr. Medley with his statement to the officer that "he had fired [the] gun too." (Doc. 1 at 16). According to Mr. Molina, this statement shows that Mr. Basden "shot the gun in addition to Mr. Medley." (Doc. 16 at 10). This allegedly would have supported Mr. Molina's claim that Mr. Basden "was firing first at [him]." (*Id.* at 11).

The postconviction court rejected this claim. (Doc. 11-1, Ex. 20, at 12). After summarizing the claim, it recounted counsel's testimony at the evidentiary hearing. (*Id.* at 11). Counsel explained that Mr. Molina "clearly misread[ ] the police report." (*Id.*) As counsel pointed out, Mr. Molina's "version" of events was that Mr. Basden "possessed and shot" the gun, "which [Mr. Molina] claimed [was] the reason [he] shot at Mr. Basden." (*Id.*) Counsel stated, however, that the "he" in the statement "he had fired [the gun] too" "could not refer to Mr. Basden firing the Glock just fired by Mr. Medley." (*Id.*) Counsel elaborated: "[T]he deposition testimony of both Mr. Medley and the [officer] reflected clearly that Mr. Medley came out to . . . the officer . . . who was in the living room attending to [Mr. Basden], holding the Glock that he had just fired, [Mr.] Medley had just fired, because he fired it at least two times. There were two shell casings for that .45 caliber Glock in the kitchen. . . . So this is just a clear misunderstanding or misreading of . . . [the police] report." (*Id.*) Indeed, counsel testified that he "would have looked silly" if he had tried to impeach Mr. Medley in this way. (*Id.*, Ex. 19, at 22).

The postconviction court credited counsel's testimony "based on his demeanor in the courtroom and because it [was] consistent with the record." (*Id.*, Ex. 20, at 11). Specifically, "the record reflect[ed] [that] two shell casings that matched . . . the gun turned over by Mr. Medley were found in the kitchen," which was "consistent with [counsel's] recall of the deposition testimonies of Mr. Medley and the [officer]"—"namely, that Mr. Medley walked from the kitchen to the living room where [the officer] was located and turned over the gun to [him]." (*Id.*) Moreover, Mr. Medley "testified at trial that he was the one to fire the gun," and Mr. Molina "failed to present any evidence at the evidentiary hearing that the 'he' in the police report [was] anyone other than Mr. Medley." (*Id.* at 11-12). Accordingly, the court found that Mr. Molina did not "establish[ ] deficient conduct or prejudice" from counsel's failure to impeach Mr. Medley with the police report. (*Id.* at 12).

This ruling was reasonable. The postconviction court accurately summarized the relevant testimony. As the court explained, nothing in the record suggested that the "he" in the police report was "anyone other than Mr. Medley." (Doc. 11-1, Ex. 20, at 12). Indeed, the only plausible reading of the statement "he had fired [the] gun too" is that Mr. Medley meant to say he not only held the gun but had fired it as well. Therefore, counsel was not deficient for failing to pursue Mr. Molina's meritless argument that the police report showed that Mr. Basden "shot the gun in addition to Mr. Medley." (Doc. 16 at 10; *see also Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim.")).

19

### F.       Ground Eight—Cumulative Error

Lastly, Mr. Molina raises a claim of cumulative error, arguing that he "received ineffective assistance of counsel based on the cumulative effect of counsel's deficient performance and ensuing prejudice." (Doc. 1 at 18). "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because each individual claim fails, Mr. Molina's cumulative-error claim necessarily lacks merit.

## IV.   Conclusion

Accordingly, the Court **ORDERS**:

1.  Mr. Molina's petition (Doc. 1) is **DENIED**.

2.  The **CLERK** is directed to enter judgment against Mr. Molina and to **CLOSE** this case.

3.  Mr. Molina is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Molina must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v.*

20

*McDaniel*, 529 U.S. 473, 484 (2000). Mr. Molina has not made the requisite showing. Because Mr. Molina is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on June 2, 2025.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE